# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 16, 2015                    Decided May 1, 2015

No. 13-7169

HELMERICH & PAYNE INTERNATIONAL DRILLING CO. AND
HELMERICH & PAYNE DE VENEZUELA, C.A.,
APPELLEES

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,
APPELLEE

PETROLEOS DE VENEZUELA, S.A. AND PDVSA PETROLEO,
S.A.,
APPELLANTS

---

Consolidated with 13-7170, 14-7008

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:11-cv-01735)

---

*Mary H. Wimberly* argued the cause for appellant/cross-appellee Bolivarian Republic of Venezuela. *Joseph D. Pizzurro* argued the cause for appellants/cross-appellees Petroleos De Venezuela, S.A. and PDVSA Petroleo, S.A. With them on the briefs were *Robert*

*B. Garcia*, *George E. Spencer*, *William L. Monts III*, and *Bruce D. Oakley*

*David W. Ogden* argued the cause for appellee/cross-appellant Helmerich & Payne De Venezuela, C.A. With him on the briefs were *David W. Bowker*, *Catherine M. Carroll*, *Elisebeth C. Cook*, and *Francesco Valentini*.

Before: GARLAND, *Chief Judge*, TATEL, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* SENTELLE.

TATEL, *Circuit Judge*: The Foreign Sovereign Immunities Act (FSIA) grants foreign states immunity from suit in American courts unless one of several enumerated exceptions applies. In this case, after Venezuela forcibly seized oil rigs belonging to the Venezuelan subsidiary of an American corporation, both the parent and the subsidiary filed suit in the United States asserting jurisdiction under the FSIA's expropriation and commercial activity exceptions. Venezuela moved to dismiss on the ground that neither exception applies. The district court granted the motion as to the subsidiary's expropriation claim, but denied it in all other respects. For the reasons set forth in this opinion, we affirm in part and reverse in part. We agree with the district court that the parent corporation had sufficient rights in its subsidiary's property to support its expropriation claim. But because the subsidiary's expropriation claim is neither "wholly insubstantial" nor "frivolous"—this Circuit's standard for surviving a motion to dismiss in an FSIA case—the district court should have

allowed that claim to proceed. And given that the subsidiary's commercial activity had no "direct effect" in the United States, which the FSIA requires to defeat foreign sovereign immunity, the district court should have granted the motion to dismiss with respect to that claim.

**I**

For more than half a century, Oklahoma-based Helmerich & Payne International Drilling Co. (H&P-IDC) successfully operated an oil-drilling business in Venezuela through a series of subsidiaries. Incorporated under Venezuelan law, the most recent subsidiary, Helmerich & Payne de Venezuela (H&P-V), provided drilling services for the Venezuelan government. Having nationalized its oil industry in the mid-70s, Venezuela now controls exploration, production, and exportation of oil through two state-owned corporations: Petróleos de Venezuela, S.A. (PDVSA) and PDVSA Petróleo, known collectively as PDVSA. From its creation in 1975 through 2010, PDVSA depended on H&P-V's highly valuable and rare drilling rigs because they were capable of reaching depths of more than four miles. Those rigs were originally purchased by H&P-IDC and then transferred to its subsidiary H&P-V. At issue here are ten contracts executed in 2007 between H&P-V and PDVSA, each involving one of these rigs—nine in Venezuela's eastern region and one in the west. The contracts initially covered periods ranging from five months to one year, though all were subsequently extended.

Soon after signing the contracts, PDVSA fell substantially behind in its payments. By August 2008, unpaid invoices totaled $63 million. PDVSA never denied its contractual debt; quite to the contrary, it repeatedly reassured H&P-V that payment would be forthcoming. But no payments were made, and after overdue receivables topped $100 million, H&P-V announced in January 2009 that it would not renew the

contracts absent "an improvement in receivable collections." Compl. ¶ 50 (internal quotation marks omitted). By November of that year, H&P-V had fulfilled all of its contractual obligations, disassembled its drilling rigs, and stacked the equipment in its yards pending payment by PDVSA.

PDVSA made no further payments. Instead, on June 12, 2010, PDVSA employees, assisted by armed soldiers of the Venezuelan National Guard, blockaded H&P-V's premises in western Venezuela, and then did the same to the company's eastern properties on June 13 and 14. PDVSA acknowledged that it erected the blockade to "prevent H&P-V from removing its rigs and other assets from its premises, and to force H&P-V to negotiate new contract terms immediately." *Id.* ¶ 63.

In the wake of the blockade, PDVSA issued a series of press releases that are central to H&P-V's expropriation claim. The first, issued on June 23, stated that "[t]he Bolivarian Government, through [PDVSA had] nationalized 11 drilling rigs belonging to the company Helmerich & Payne[], a U.S. transnational firm." *Id.* ¶ 65. A second press release, dated June 25, declared that PDVSA's "workers are guarding the drills" and that:

> The nationalization of the oil production drilling rigs from the American contractor H&P not only will result in an increase of oil and gas production in the country, but also in the release of more than 600 workers and the increase of new sources of direct and indirect employment in the hydrocarbon sector.

*Id.* ¶ 66. The June 25 release also "emphatically reject[ed] statements made by spokesmen of the American empire—traced [*sic*] in our country by means of the oligarchy." *Id.* ¶ 108 (alterations in original). Another press

release, this one undated, stated that the nationalization would "guarantee that the drills will be operated by PDVSA as a company of all Venezuelans, . . . ensur[ing] the rights of former employees of H&P, who a year ago were exploited and then dismissed by this American company, but now they will become part of PDVSA." *Id*. ¶ 109.

On June 29, more than two weeks after the blockade began, the Venezuelan National Assembly issued an official "Bill of Agreement" declaring H&P-V's property to be "of public benefit and good" and recommending that then-President Hugo Chavez promulgate a Decree of Expropriation. *Id*. ¶ 4. President Chavez issued the decree, which emphasized that "the availability of drilling equipment [such as H&P-V's] is very low both in the country and at world level, and the lack thereof would affect [Venezuela's national oil drilling] Plan." *Id*. ¶¶ 4, 19 (alterations in original). The decree directed PDVSA to take "forcible" possession of H&P-V's drilling rigs and other property. *Id*. ¶ 4. In response, PDVSA, having already taken possession of the property, issued a press release on July 2, which stated that H&P-V's rigs "are specialized drills we need for more complex sites" and "will be very useful." *Id*. ¶ 20.

That same day, Jesus Graterol, president of the Venezuelan National Assembly's Committee on Energy and Mines, criticized opponents of the nationalization for acting "in accordance with the instructions of the [U.S.] Department of State" and trying to "subsidize the big business transnational corporations, so that they can promote what they know best to do, which is war . . . through the large military industry[] of the Empire and its allies." *Id*. ¶ 105 (first alteration in original). Rafael Ramirez, Venezuela's Minister of Energy and Petroleum and PDVSA's President, led a political rally at H&P-V's eastern site and declared:

> The company Helmerich & Payne has operated in our country for many years. Today, the Revolutionary Government took control over that company. You have been here guarding assets that now belong to the Venezuelan State. I acknowledge and appreciate your constant watch in order to protect the people's interests. Revolutionary salutation: Socialist Nation or Death. We shall be victorious!

*Id.* ¶ 5 (ellipses omitted). Ramirez also referred to H&P-V as an "American company" with "foreign gentlemen investors" and Venezuelan workers who would now "become part of [PDVSA's] payroll." *Id.* As Ramirez predicted, PDVSA now uses H&P-V's rigs and other assets in its state-owned drilling business.

Supposedly to compensate H&P-V for the expropriated property, PDVSA filed two eminent domain actions in Venezuelan courts. H&P-V has yet to receive service of process in the first proceeding, and the second has been stayed indefinitely. Believing that these proceedings are unlikely to result in adequate relief, H&P-V and its American parent, H&P-IDC, filed a two-count complaint under the FSIA in the United States District Court for the District of Columbia. The first count, brought against PDVSA and Venezuela, alleges a taking of property in violation of international law and asserts jurisdiction under the FSIA's expropriation exception. The second count, brought only against PDVSA, alleges breach of the ten drilling contracts and asserts jurisdiction under the statute's commercial activity exception.

Venezuela and PDVSA moved to dismiss on the grounds that neither FSIA exception applies and that the act-of-state

doctrine, under which American courts "will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders," *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004), bars the suit altogether. Before the district court could decide this motion, the parties filed a joint stipulation in which they agreed to brief four threshold issues:

1. Whether, for purposes of determining if a "taking in violation of international law" has occurred under the FSIA's expropriation exception, H&P-V is a national of Venezuela under international law;

2. Whether H&P-IDC has standing to assert a taking in violation of international law on the basis of Venezuela's expropriation of H&P-V's property;

3. Whether plaintiffs' expropriation claims are barred by the act-of-state doctrine, including whether this defense may be adjudicated prior to resolution of Venezuela's challenges to the court's subject matter jurisdiction; and

4. Whether, for purposes of determining the applicability of the FSIA's commercial activity exception, plaintiffs have sufficiently alleged a "direct effect" in the United States within the meaning of that provision.

The district court resolved the first question in Venezuela's favor but sided with Helmerich & Payne on the other three. Venezuela and PDVSA now appeal, reiterating arguments they made in the district court. H&P-V cross-appeals on the first question. We review de novo a district court's resolution of a motion to dismiss for lack of jurisdiction under the FSIA. *See de Csepel v. Republic of*

*Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013). Critically, moreover, "we must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor." *Id.* (internal quotation marks omitted).

## II

The FSIA "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992). The Act provides that "a foreign state *shall* be immune from the jurisdiction of the courts of the United States and of the States," 28 U.S.C. § 1604 (emphasis added), unless one of several exceptions applies, *id.* §§ 1605–07. H&P-V and H&P-IDC invoke the expropriation exception for their takings claim. H&P-V invokes the commercial activity exception for its breach of contract claim. We address each in turn.

### Expropriation Exception

This exception, contained in FSIA section 1605(a)(3), denies foreign sovereign immunity "in any case . . . in which rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). According to Venezuela, the exception is inapplicable here for two reasons. First, as a Venezuelan national, H&P-V may not claim a taking in violation of *international* law. Second, under generally applicable corporate law principles, H&P-IDC has no "rights in property" belonging to its subsidiary and thus lacks standing.

In deciding a motion to dismiss for lack of jurisdiction, we are mindful of the distinction between jurisdiction—a court's constitutional or statutory power to decide a case—and ultimate success on the merits. As the Supreme Court has

explained, "[j]urisdiction . . . is not defeated . . . by the possibility that the averments [in a complaint] might fail to state a cause of action on which petitioners could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946). What plaintiffs must allege to survive a jurisdictional challenge, then, "is obviously far less demanding than what would be required for the plaintiff's case to survive a summary judgment motion" or a trial on the merits. *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008). In an FSIA case, we will grant a motion to dismiss on the grounds that the plaintiff has failed to plead a "taking in violation of international law" or has no "rights in property . . . in issue" *only* if the claims are "wholly insubstantial or frivolous." *Id*. at 943. A claim fails to meet this exceptionally low bar if prior judicial decisions "inescapably render the claim[] frivolous" and "completely devoid of merit." *Hagans v. Lavine*, 415 U.S. 528, 538, 543 (1974). "[P]revious decisions that merely render claims of doubtful or questionable merit do not render them insubstantial" for jurisdictional purposes. *Id*. at 538. Applying this standard to the present case, and viewing the complaint "in the light most favorable to the plaintiff," *Sachs v. Bose*, 201 F.2d 210, 210 (D.C. Cir. 1952), we first consider whether H&P-V has asserted a non-frivolous international expropriation claim and then ask whether H&P-IDC has "put its rights in property in issue in a non-frivolous way," *Chabad*, 528 F.3d at 941.

As to the first inquiry, the parties begin on common ground. All agree that for purposes of international law, "a corporation has the nationality of the state under the laws of which the corporation is organized," Restatement (Third) of Foreign Relations Law § 213 (1987), and that generally, a foreign sovereign's expropriation of its own national's property does not violate international law, *United States v. Belmont*, 301 U.S. 324, 332 (1937). The Supreme Court has

summarized the latter principle, known as the "domestic takings rule," this way: "What another country has done in the way of taking over property of its nationals, and especially of its corporations, is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled." *Id*.

According to Venezuela, the domestic takings rule ends this case because H&P-V, as a Venezuelan national, may not seek redress in an American court for wrongs suffered in its home country. This argument has a good deal of appeal. Having freely chosen to incorporate under Venezuelan law, H&P-V operated in that country for many years and reaped the benefits of its choice, including several extremely lucrative contracts with the Venezuelan government. Given this, and especially given that H&P-V expressly agreed that these contracts would be governed by Venezuelan law in Venezuelan courts, one might conclude that H&P-V should live with the consequences of its bargain.

According to H&P-V, however, this case is not so simple. It argues that Venezuela has unreasonably discriminated against it on the basis of its sole shareholder's nationality, thus implicating an exception to the domestic takings rule. In support, H&P-V cites *Banco Nacional de Cuba v. Sabbatino*, 307 F.2d 845, 861 (2d Cir. 1962), in which the Second Circuit determined that the Cuban government's expropriation of a Cuban corporation's property qualified as a taking in violation of international law. More than 90% of the Cuban corporation's shares were owned by Americans, and the official expropriation decree "clearly indicated that the property was seized because [the corporation] was owned and controlled by Americans." *Id.* This, the Second Circuit held, justified disregarding the domestic takings rule: "When a foreign state treats a corporation in a particular way because of

the nationality of its shareholders, it would be inconsistent for [the court] in passing on the validity of that treatment to look only to the nationality of the corporate fiction." *Id.* (internal quotation marks omitted). Although the Supreme Court vacated this decision on other grounds, the Second Circuit later reiterated "with emphasis" its decision to disregard the domestic takings rule in the face of Cuba's anti-American discrimination. *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 185 (2d Cir. 1967).

H&P-V also relies on the most recent Restatement of Foreign Relations Law, which recognizes discriminatory takings as a violation of international law. Specifically, section 712 suggests that "a program of taking that singles out aliens generally, or aliens of a particular nationality, or particular aliens, would violate international law." Restatement (Third) of Foreign Relations Law § 712 cmt. f. (1987). "Discrimination," the Restatement continues, "implies *unreasonable* distinction," and so "[t]akings that invidiously single out property of persons of a particular nationality would be [discriminatory]," whereas "classifications, even if based on nationality, that are rationally related to the state's security or economic policies might not be [discriminatory]" and thus not in violation of international law. *Id.* (emphasis added). The reporter's notes to section 712 cite *Sabbatino* as an example of a discriminatory taking, explaining that Cuba's express "purpose was to retaliate against United States nationals for acts of their Government, and was directed against United States nationals exclusively." *Id.* § 712 reporter's note 5.

H&P-V insists that its complaint, which emphasizes the Venezuelan government's well-known anti-American sentiment, as well as PDVSA's statements decrying the "American empire," successfully pleads a discriminatory takings claim. For its part, Venezuela urges us not to "be the

first to revive the overturned Second Circuit precedent" because "there is no internationally recognized exception—based on 'discrimination' or otherwise—to the domestic takings rule." Defs.' Cross Br. 28, 30. Dated and uncited as it may be, however, *Sabbatino* remains good law. *See Farr*, 383 F.2d at 166 (affirming *Sabbatino*'s discriminatory takings rationale "with emphasis"). Although "we are not *bound* by the decisions of other circuits," Dissent at 3 (emphasis added), we may "of course . . . find the reasons given for such [decisions] persuasive," *Northwest Forest Resource Council v. Dombeck*, 107 F.3d 897, 900 (D.C. Cir. 1997) (quoting James Moore et al., *Moore's Federal Practice* ¶ 0.402 (2d ed. 1996))—especially where, as here, our circuit has yet to consider the issue. Moreover, neither Venezuela nor the dissent cites any decision from any circuit that so completely forecloses H&P-V's discriminatory takings theory as to "*inescapably* render the claim[] frivolous" and "*completely* devoid of merit." *Hagans*, 415 U.S. at 538 (emphases added). Given this, and given the Restatement's recognition of discriminatory takings claims, we believe that H&P-V has satisfied this Circuit's forgiving standard for surviving a motion to dismiss in an FSIA case.

Alternatively, Venezuela claims that even if international law recognizes discriminatory takings, "plaintiffs have failed to plead facts to support it" because "the motivation for the expropriation was Venezuela's need for H&P-V's uniquely powerful rigs." Defs.' Br. 31. As it points out, the official decrees cited only the scarcity of these powerful rigs as the reason for the expropriation. The Bill of Agreement, for example, declared H&P-V's drilling rigs necessary for Venezuela's "public benefit and good," Compl. ¶ 4, and President Chavez's decree stated that "the lack thereof would affect [Venezuela's national oil drilling] Plan," *id*. ¶ 19 (alteration in original). Based on these statements, it may well

be, as the Restatement puts it, that the taking was "rationally related to [Venezuela's] security or economic policies." Restatement (Third) of Foreign Relations Law § 712 cmt. f (1987).

Other statements, however, went well beyond Venezuela's economic and security needs and could be viewed as demonstrating "unreasonable distinction" based on nationality. *Id*. PDVSA's press release referred to the "American empire," Compl. ¶ 108, and a National Assembly member warned that opponents of the expropriation were supporting America's mission of "war[] . . . through the large military industry[] of the Empire and its allies," *id*. ¶ 105. At this stage of the litigation, where we view the complaint "in the light most favorable to the plaintiff," *Sachs*, 201 F.2d at 210, these statements are sufficient to plead a "non-frivolous" discriminatory takings claim, *Chabad*, 528 F.3d at 941.

We turn next to Venezuela's argument that H&P-IDC may not invoke the FSIA's expropriation exception because it has no rights in H&P-V's property. By its terms, the expropriation exception applies only to plaintiffs having "rights in property" taken in violation of international law. Moreover, and quite apart from the FSIA, plaintiffs must demonstrate Article III standing by asserting their "own legal rights and interests" rather than resting "claim[s] to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The "shareholder standing rule" is an example of this latter principle. Because corporations are legally distinct from their shareholders, the rule "prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Board of California v. Alcan Aluminium Limited*, 493 U.S. 331, 336 (1990). Combining both of these

principles, Venezuela argues that as a mere shareholder, H&P-IDC has no rights in the property of its subsidiary and thus lacks standing.

In support of this argument, Venezuela relies almost entirely on *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), an FSIA case in which the Supreme Court held that "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary." *Id.* at 475. This, according to Venezuela, means that "in enacting the FSIA, Congress specifically intended that basic corporate law concepts inform the interpretation of the statute," Defs.' Opening Br. 23, and thus "rights in property" must mean corporate ownership.

Contrary to Venezuela's assertion, however, *Dole Food* does not represent a wholesale incorporation of corporate law into the FSIA. The issue in that case was whether a corporate subsidiary qualified as an instrumentality of a foreign state under the FSIA where the foreign state did not own a majority of the subsidiary's shares but did own a majority of the corporate parent's shares. *Dole Food Co.*, 538 U.S. at 471. Answering that question in the negative, the Court focused on FSIA section 1603(b)(2), which defines "instrumentality" as "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof[.]" *Id.* at 473. Given this definition, the Court refused to "ignore corporate formalities" not because the FSIA generally incorporates corporate law principles, but because section 1603(b)(2) expressly "speaks of ownership." *Id.* at 474.

By contrast, FSIA section 1605(a)(3), the expropriation exception, speaks only of "rights in property" generally, not ownership in shares. The Supreme Court's analysis of another

FSIA exception is instructive.   In *Permanent Mission of India to the United Nations v. City of New York*, the Court examined the FSIA's abrogation of sovereign immunity in cases involving "rights in immovable property situated in the United States." 551 U.S. 193, 197 (2007) (quoting 28 U.S.C. § 1605(a)(4)). An instrumentality of the Indian government argued that the FSIA "limits the reach of the exception to actions contesting ownership or possession." *Id.* Seeing no such limitation in the statute's text, the Court concluded that "the exception focuses more broadly on 'rights in' property." *Id.* at 198.

So too here. The expropriation exception requires only that "rights in property . . . are in issue," § 1605(a)(3), and we have recognized that corporate ownership aside, shareholders may have rights in corporate property. In *Ramirez de Arellano v. Weinberger*, for example, we considered whether an American citizen, the sole shareholder of three Honduran corporations, had a "cognizable property interest" in land owned by the Honduran corporations and seized by the United States government. 745 F.2d 1500, 1517 (D.C. Cir. 1984), *cert. granted, judgment vacated on other grounds*, 471 U.S. 1113 (1985). Whether Ramirez had property rights in the land, we held, "does *not* turn on whether certain rights which may belong *only* to the Honduran corporation may be asserted 'derivatively' by the sole United States shareholders." *Id.* at 1516. Instead, property rights depend upon whether the shareholders have "rights *of their own,* which exist by virtue of their exclusive beneficial ownership, control, and possession of the properties and businesses allegedly seized." *Id.* We thus concluded that notwithstanding corporate ownership, Ramirez had property rights in the Honduran property that he "personally controlled and managed . . . for over 20 years." *Id.* at 1520. "The corporate ownership of land and property," we held, "does not deprive the sole beneficial owners—United

States citizens—of a property interest." *Id*. at 1518; *see also Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 713 (1974) (rejecting the argument that, in assessing standing, courts "may not look behind the corporate entity to the true substance of the claims and the actual beneficiaries").

Our dissenting colleague questions the precedential value of *Ramirez* because it was vacated by the Supreme Court on other grounds. Dissent at 4–5. But we have held that "[w]hen the Supreme Court vacates a judgment of this court without addressing the merits of a particular holding in the panel opinion, that holding 'continue[s] to have precedential weight, and in the absence of contrary authority, we do not disturb' it." *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006) (quoting *Action Alliance of Senior Citizens of Greater Philadelphia v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991)). Because the Supreme Court did not address *Ramirez*'s holding that the shareholders had property rights in their corporation's assets, but instead vacated and remanded in light of the U.S. military's subsequent withdrawal of all personnel and facilities from the plaintiffs' land, *De Arellano v. Weinberger*, 788 F.2d 762, 764 (D.C. Cir. 1986) (en banc) (per curiam); *see Weinberger v. Ramirez de Arellano*, 471 U.S. 1113 (1985), that holding continues to have "precedential weight," *Adewani*, 467 F.3d at 1342.

The dissent argues that even if *Ramirez* continues to have force, it "is not genuinely on point" because it concerned property rights arising from the constitution's due process clause. Dissent at 5. But as discussed above, the FSIA's expropriation exception "focuses . . . *broadly* on 'rights in' property," *Permanent Mission*, 551 U.S. at 198 (emphasis added), and its text imposes no limitation on the source of those rights.

*Ramirez* is especially persuasive in this case because H&P-IDC, like the American citizen in *Ramirez*, was the foreign subsidiary's sole shareholder. Moreover, H&P-IDC provided the rigs central to this dispute, Compl. ¶¶ 9, 129–32, and as a result of the expropriation, has suffered a total loss of control over its subsidiary, which has ceased operating as an ongoing enterprise because *all* of its assets were taken, Compl. ¶¶ 75, 81–82. Under these circumstances, H&P-IDC has "put its rights in property in issue in a non-frivolous way." *Chabad*, 528 F.3d at 941. No more is required to survive a motion to dismiss under the FSIA. *See id*. ("non-frivolous contentions" of rights in property suffice to survive a motion to dismiss).

One final point. In the district court, Venezuela urged dismissal of Helmerich & Payne's expropriation claims pursuant to the act-of-state doctrine, which "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964). The district court never reached the issue, opting instead to determine "whether subject-matter jurisdiction exists under the FSIA before deciding whether to dismiss the case under the act of state doctrine." *Helmerich & Payne International Drilling Co. v. Bolivarian Republic of Venezuela*, 971 F. Supp. 2d 49, 63 (D.D.C. 2013). Acknowledging that the district court's decision is not subject to interlocutory appeal, *see, e.g.*, *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 855 (D.C. Cir. 2000), Venezuela urges us to exercise pendant jurisdiction over this claim. But we "exercise such jurisdiction sparingly" and are especially reluctant to do so where "an issue . . . might be mooted or altered by subsequent district court proceedings." *Id*. Here, Helmerich & Payne's expropriation claims could well fail at the summary judgment stage or following trial on the merits, thus mooting the

act-of-state issue. Given this, we think it best not to exercise pendant jurisdiction over Venezuela's act-of-state claim.

## Commercial Activity Exception

This brings us, finally, to H&P-V's argument that the FSIA's commercial activity exception extends to its breach of contract claim against PDVSA. This exception, contained in section 1605(a)(2), nullifies foreign sovereign immunity in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; *or* upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; *or* upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2)(emphases added). Because this case involves a contract executed and performed outside the United States, our analysis focuses on the exception's third clause—specifically, whether Venezuela's breach of the drilling contracts "cause[d] a direct effect in the United States." *Id*. A direct effect "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994). H&P-V alleges three such effects.

First, relying on our decision in *Cruise Connections Charter Management v. Canada*, 600 F.3d 661 (D.C. Cir. 2010), H&P-V argues that its contracts with third-party vendors in the United States, made pursuant to the drilling

contracts, constitute a direct effect. In *Cruise Connections*, we found a "direct effect" where the Royal Canadian Mounted Police (RCMP) cancelled a contract with a U.S. corporation to provide cruise ships during the 2010 Winter Olympics. *Id*. at 662. H&P-V argues that just as in *Cruise Connections*, where the RCMP contract "required . . . subcontract[s] with two U.S.-based cruise lines," *id*., its agreements with PDVSA required contracts with U.S.-based companies for various drilling rig parts. PDVSA responds that even if H&P-V subcontracted with U.S. vendors, nothing in the drilling contracts obligated them to do so.

We need not resolve this dispute, however, because even assuming that the drilling contracts required subcontracts with American companies, those contracts had no direct effect in the United States. Our holding in *Cruise Connections* rested not on the mere formation of third-party contracts in the United States, but rather on "*losses* caused by the *termination* of [the] contract with [Royal Canadian Mounted Police]." *Cruise Connections*, 600 F.3d at 664 (emphases added); *see also id*. at 666 (noting that the "alleged breach resulted in the direct loss of millions of dollars worth of business in the United States."). Here, H&P-V concedes that none of the third-party contracts was breached. Compl. ¶¶ 126–128, 135. As a result, no losses, and therefore no "direct effect," occurred in the United States.

We are unpersuaded by H&P-V's argument that its inability to renew the third-party contracts constitutes a direct effect caused by PDVSA's breach. Pls.' Br. 62. As noted above, H&P-V had already performed all of its obligations under the existing third-party contracts. Its claim of third-party loss is therefore based on expected loss from *future* contracts that H&P-V says it would have entered into had PDVSA renewed its own contracts with H&P-V instead of breaching them. But H&P-V makes no allegation that PDVSA had an

*obligation* to renew its contracts. *See* Compl. ¶ 33 ("All ten contracts . . . expired at the conclusion of an agreed-upon period unless the parties agreed to an extension or an extension occurred by the contract's original terms."). Accordingly, any losses to third parties based on expected future contracts were not a direct effect of PDVSA's breach, but rather of PDVSA's contractually permitted decision not to renew its agreement with H&P-V.

Contrary to H&P-V's argument, *Kirkham v. Société Air France*, 429 F.3d 288 (D.C. Cir. 2005), does not require a different result. *Kirkham* involved the commercial activity exception's first clause. *See id.* at 290. H&P-V invokes the exception's third clause, under which the "direct effect" in the United States must arise from the foreign state's allegedly unlawful act—here, the breach of contract. *See Republic of Argentina v. Weltover*, 504 U.S. 607, 609 (1992) (examining "whether the Republic of Argentina's default on certain bonds" had a direct effect in the United States).

Relying on the Supreme Court's decision in *Republic of Argentina v. Weltover*, 504 U.S. 607 (1992), H&P-V claims a second effect in the United States: that PDVSA made payments to Helmerich & Payne's Oklahoma bank account. In *Weltover*, Argentina had issued bonds providing for payment through a currency transfer on the London, Frankfurt, Zurich, or New York markets at the discretion of the creditor. *Id.* at 609–10. Two Panamanian bondholders demanded payment in New York, and when Argentina failed to pay, brought suit in the United States, claiming jurisdiction under the commercial activity exception. *Id.* at 610. The Court had "little difficulty" finding a direct effect because, as a result of Argentina's failure to meet its payment obligations, a contractually required payment into an American bank was not made. *Id.* at 618–19. Relying on *Weltover*, H&P-V emphasizes that both the eastern

and western contracts permitted PDVSA to pay a portion of invoiced amounts in U.S. dollars into an American bank—indeed, PDVSA ultimately paid $65 million this way. Compl. ¶ 44. As in *Weltover*, then, PDVSA's breach meant that money "that was supposed to have been delivered to [an American] bank for deposit was not forthcoming." 504 U.S. at 619. But as PDVSA points out, the contracts gave H&P-V no power to demand payment in the United States. Rather, under both the eastern and western contracts, PDVSA could choose to deposit payments in bolivars in Venezuelan banks whenever, in its "exclusive discretion" and "judgment," it "deem[ed] it discretionally convenient." Compl. ¶¶ 78, 85, 82.

This case presents facts akin to those we examined in *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1144 (D.C. Cir. 1994), in which an Iraqi bank failed to pay on letters of credit, and the payee claimed that the bank's prior payments from its accounts in the United States constituted a direct effect. We rejected this contention because pursuant to the letters of credit, Iraq "might well have paid . . . from funds in United States banks but it might just as well have done so from accounts located outside of the United States." *Id.* at 1146–47. Such unlimited discretion, we concluded, meant that unlike in *Weltover*, no money was "'supposed' to have been paid" in the United States. *Id.* at 1146 (quoting *Weltover*, 504 U.S. at 608). In other words, where, as here, the alleged effect depends solely on a foreign government's discretion, we cannot say that it "flows in a straight line without deviation or interruption." *Princz*, 26 F.3d at 1172.

Finally, relying on *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346 (D.C. Cir. 1995), H&P-V contends that PDVSA's breach halted a flow of commerce between Venezuela and the United States, thus causing a direct effect. McKesson, an American corporation, alleged that the Iranian

government had illegally divested it of its investment in a dairy located in Iran. *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 441 (D.C. Cir. 1990). In doing so, we concluded, Iran halted a "constant flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging, between the United States and Iran to support the operation of [the dairy]," thereby causing a direct effect. *Id.* at 451. H&P-V insists that the same is true here. We think not. Iran's actions in "freezing-out American corporations in their ownership of [the dairy]" had the direct and immediate effect of halting a flow of resources and capital between the United States and Iran. *Id.* By contrast, any interruptions in commerce between the United States and PDVSA flowed immediately not from PDVSA's breach of contract, but rather from Helmerich & Payne's decision to cease business in Venezuela. And, given that the contracts were for set periods of time ranging from five months to one year, there was no guarantee of future business between Helmerich & Payne and PDVSA beyond those contracts.

### III

We affirm the district court's denial of Venezuela's motion to dismiss H&P-IDC's expropriation claim. In all other respects, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, dissenting in part and concurring in part: I will not reiterate the facts in this controversy, as the careful opinion of the majority sets them forth in necessary detail and with inerrant accuracy. Further, I fully concur in the majority's discussion and conclusion concerning the issues related to the commercial activity exception set forth in 28 U.S.C. § 1605(a)(2). However, despite my general agreement with the majority's exposition of the facts underlying the claim for expropriation, I dissent from the conclusion that those facts bring this case within the expropriation exception set forth in 28 U.S.C. § 1605(a)(3).

As the majority recognizes, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, *et. seq.*, "'establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state.'" Maj. Op. at 8 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992)). As the majority further recognizes, "[t]he Act provides that 'a foreign state *shall* be immune from the jurisdiction of the courts of the United States and of the States.'" Maj. Op. at 8 (emphasis in original) (quoting 28 U.S.C. § 1604). Therefore, unless the expropriation claim falls within one of the exceptions set forth in 28 U.S.C. §§ 1605–07, the district court, and derivatively this court, has no jurisdiction over the claim. The majority concludes that claim falls within the exception created by § 1605(a)(3). I disagree.

That exception permits the courts of the United States to exercise jurisdiction "in any case . . . in which rights in property taken *in violation of international law* are in issue." § 1605(a)(3) (emphasis added). The majority states, Venezuela argues that "as a Venezuelan national, H&P-V may not claim a taking in violation of *international* law." Maj. Op. at 8 (emphasis in original). Further, "under generally applicable corporate law principles, H&P-IDC has no 'rights in property'

belonging to its subsidiary and thus lacks standing," to bring this action. Maj. Op. at 8. I again look to the majority's statement of the facts which acknowledges: "All [parties] agree that for purposes of international law, 'a corporation has the nationality of the state under the laws of which the corporation is organized.'" Maj. Op. at 9 (quoting Restatement (Third) of Foreign Relations Law § 213 (1987)).

The majority further recognizes "that generally, a foreign sovereign's expropriation of its own national's property does not violate international law." Maj. Op. at 9 (citing *United States v. Belmont*, 301 U.S. 324, 332 (1937)). This principle is known as the domestic takings rule, which provides that "[w]hat another country has done in the way of taking over property of its nationals, and especially of its corporations, is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled." *Belmont*, 301 U.S. at 332.

Like the majority, I recognize that Venezuela's position in this litigation is that

> the domestic takings rule ends this case because H&P-V, as a Venezuelan national, may not seek redress in an American court for wrongs suffered in its home country. This argument has a good deal of appeal. Having freely chosen to incorporate under Venezuelan law, H&P-V operated in that country for many years and reaped the benefits of its choice, including several extremely lucrative contracts with the Venezuelan government. Given this, and especially given that H&P-V expressly agreed that these contracts would be governed by Venezuelan law in Venezuelan courts, one might conclude that H&P-V should live with the consequences of its bargain.

Maj. Op. at 10. Unlike the majority, I believe that Venezuela's position is well taken. When appellees chose to incorporate under Venezuelan law, they bargained for treatment under Venezuelan law. To extend our examination of Venezuelan law to adjudicate its fairness appears to me to violate Venezuela's sovereignty, the value protected by the FSIA.

The majority supports its extended examination with the decision in *Banco Nacional de Cuba v. Sabbatino*, 307 F.2d 845, 861 (2d Cir. 1962). While that case may stand for the proposition that the courts of the United States can examine the fairness of a foreign sovereign's expropriation, I cannot join the majority's conclusion that "*Sabbatino* remains good law." Maj. Op. at 12. Perhaps *Sabbatino* is good law in the Second Circuit, but we are not bound by the decisions of other circuits, and I do not conclude that *Sabbatino* has ever been or remains good law in the District of Columbia Circuit. I would, therefore, conclude that Venezuela's reliance on the domestic takings rule is well taken and should compel the dismissal of Helmerich & Payne's expropriation claim for want of jurisdiction.

I would further note that I differ with the majority's apparent belief that Venezuela's reliance upon *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), is misplaced. *See* Maj. Op. at 14. The majority asserts that "[c]ontrary to Venezuela's assertion, . . . *Dole Food* does not represent a wholesale incorporation of corporate law into the FSIA." *Id.* While this may be literally accurate, it is at least equally accurate that neither *Dole Food* nor any other case constitutes a wholesale rejection of corporate law. As both the majority's opinion and mine have recognized, shareholders ordinarily have no standing to assert claims on behalf of a corporation for its property.

Neither do I find compelling the majority's reliance on two cases from this circuit: *Agudas Chasidei Chabad of U.S. v.*

*Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008), and *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1517 (D.C. Cir. 1984), *cert. granted, judgment vacated on other grounds*, 471 U.S. 1113 (1985).  *Chabad* is authority, at most, for the proposition that "[i]n an FSIA case, we will grant a motion to dismiss on the grounds that the plaintiff has failed to plead a 'taking in violation of international law' or has no 'rights in property . . . in issue' *only* if the claims are 'wholly insubstantial or frivolous.'" Maj. Op. at 9 (quoting *Chabad*, 528 F.3d at 942) (emphasis in original).  As the plaintiff here has, by reason of the domestic takings rule, failed to plead a "taking in *violation of international law*," *Chabad* supports rather than undermines Venezuela's motion for dismissal.  528 F.3d at 943 (emphasis added).  *Ramirez* warrants no separate discussion.

I would note first that the judgment in *Ramirez* was vacated by the Supreme Court.  *Weinberger v. Ramirez de Arellano*, 471 U.S. 1113 (1985).  As the majority states,

> we have held that, "[w]hen the Supreme Court vacates a judgment of this court without addressing the merits of a particular holding in the panel opinion, that holding 'continue[s] to have precedential weight, and in the absence of contrary authority, we do not disturb' it." *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006) (quoting *Action Alliance of Senior Citizens of Greater Philadelphia v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991)).

Maj. Op. at 16.  For what it's worth, I question whether the language quoted from *Adewani* and *Action Alliance* in fact states a *holding* of this court to the effect that we are *bound* by the reasoning of vacated opinions.  Rather, each instance paraphrases language of Justice Powell quoted in a parenthetical following the quoted language from *Action Alliance*.  *Action Alliance* parenthetically quoted Justice Powell as stating:

> Although a decision vacating a judgment necessarily prevents the opinion of the lower court from being the law of the case, . . . the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as persuasive authority if not the governing law . . . .

*County of Los Angeles v. Davis*, 440 U.S. 625, 646 n.10 (Powell, J., dissenting) (quoted in *Action Alliance*, 930 F.2d at 83–84). In other words, the prior reasoning of the court in vacated opinions may be persuasive, even powerfully persuasive, but I question whether it is binding precedent.

Be that as it may, *Ramirez* is not genuinely on point. *Ramirez* dealt with the question of whether the shareholders of a corporation ousted by acts of the United States government had a property interest warranting due process protection under the Constitution. The *Ramirez* Court had no occasion to consider whether the statutory waiver of a foreign government's sovereign immunity encompasses the sort of second degree property interest protected against invasion by our government under the due process concepts of our Constitution.