# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 30, 2018        Decided August 7, 2018

No. 13-7169

HELMERICH & PAYNE INTERNATIONAL DRILLING CO.,
APPELLEE

HELMERICH & PAYNE DE VENEZUELA, C.A.
APPELLEE/CROSS-APPELLANT

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
APPELLANTS/CROSS-APPELLEES

---

Consolidated with 13-7170, 14-7008

---

On Remand from the Supreme Court of the United States

---

*Catherine E. Stetson* argued the cause for the appellants/cross-appellees. With her on the briefs were *William L. Monts, III*, *Mitchell P. Reich*, *Bruce D. Oakley*, *Joseph D. Pizzurro*, *Robert B. García*, *Kevin A. Meehan*, and *Juan O. Perla*.

*Catherine M.A. Carroll* argued the cause for appellees/cross-appellant. With her on the briefs were *David W. Ogden* and *David W. Bowker*.

*Jessie K. Liu*, U.S. Attorney, and *Douglas N. Letter*, *Sharon Swingle*, and *Lewis S. Yelin*, Attorneys, U.S. Department of Justice, were on the brief for *amicus curiae* United States of America.

Before: GARLAND, *Chief Judge*, TATEL, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and concurring in the judgment filed by *Senior Circuit Judge* SENTELLE.

TATEL, *Circuit Judge*: After Venezuela and two of its agencies seized all assets of an American drilling company's Venezuelan subsidiary, both parent and subsidiary sued in federal court. In a prior opinion, we held that, notwithstanding the defendants' efforts to invoke sovereign immunity, both companies' suits could go forward because each company had, consistent with the then-governing circuit standard, made a "non-frivolous" claim that its case fell into a statutory immunity exception that permits suit against foreign-state defendants in certain cases involving takings that violate international law. *Helmerich & Payne International Drilling Co. v. Bolivarian Republic of Venezuela* (*Helmerich II*), 784 F.3d 804, 814, 816 (D.C. Cir. 2015) (quoting *Agudas Chasidei Chabad of United States v. Russian Federation*, 528 F.3d 934, 941 (D.C. Cir. 2008)). The Supreme Court, however, overturned this circuit's "nonfrivolous-argument standard" and vacated our prior judgment. *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.* (*Helmerich III*), 137 S. Ct. 1312, 1324 (2017). Tasked now on remand with determining whether either company has alleged facts that are sufficient, if true, to establish that it has *in fact* suffered a taking in violation of international law, we conclude that only the

American parent—and not its Venezuelan subsidiary—has done so. We therefore affirm the district court's dismissal of the subsidiary's claims, as well as its denial of the defendants' motions to dismiss the parent's claims.

## I.

The parties agree that we are to resolve the issues presented here "solely on the basis of the allegations in the complaint." Joint Stipulation and Motion to Establish a Briefing Schedule for the Adjudication of Defendants' Motions to Dismiss at 2, *Helmerich & Payne International Drilling Co. v. Bolivarian Republic of Venezuela* (*Helmerich I*), 971 F. Supp. 2d 49 (D.D.C. 2013) (No. 11-cv-1735) ("Stipulation"), ECF No. 34. We therefore draw our factual recitation from the complaint's allegations, assuming their truth and construing them in the light most favorable to the plaintiff companies. *See Helmerich II*, 784 F.3d at 811.

Starting in the late 1990s, Venezuelan company Helmerich & Payne de Venezuela, C.A. (H&P-V), a wholly owned subsidiary of Oklahoma-based Helmerich & Payne International Drilling Co. (H&P-IDC), began providing exclusive oil- and gas-drilling services to Venezuelan state-owned entities, including Petróleos de Venezuela, S.A., and PDVSA Petróleo, S.A. (collectively, PDVSA), that own and manage Venezuela's oil reserves. Compl. ¶ 2. In order to overcome Venezuela's "difficult geological conditions," H&P-V acquired "some of the largest, most powerful, and deepest-drilling, land-based drilling rigs available," *id.* ¶ 21, and developed "a substantial infrastructure needed to maintain, repair, operate, and transport [its] drilling equipment," *id.* ¶ 25.

The companies' relationship with PDVSA soured after Venezuela's then-President Hugo Chávez replaced much of PDVSA's workforce in the wake of a 2002–03 strike. *Id.* ¶ 28.

From then on, PDVSA "refused to make timely payments" under its drilling contracts, *id.* ¶ 29, and by June 2009, PDVSA had racked up over $113 million in debt to H&P-V, *id.* ¶ 51. Consequently, when the contracts began expiring in early 2009, H&P-V "made clear to [PDVSA] that it would not enter into new contracts or restart drilling operations unless [PDVSA] paid a substantial amount of [its] outstanding debt." *Id.* ¶ 52. Despite these warnings, PDVSA stopped all payments to H&P-V in May 2010, with somewhere near $32 million in debt remaining. *Id.* ¶ 56.

Matters deteriorated further the following month. In mid-June 2010, seeking "to force H&P-V to negotiate new contract terms immediately" and to forgive PDVSA's outstanding debt, *id.* ¶ 63, PDVSA employees, acting with assistance from the Venezuelan National Guard and at the behest of the Venezuelan government, blockaded eleven of H&P-V's drilling sites, *id.* ¶¶ 59–61, 65. According to contemporaneous PDVSA press releases, the Venezuelan government had in effect "nationalized" these drilling operations. *Id.* ¶ 65.

Venezuela made the nationalization official soon thereafter. The Venezuelan National Assembly began by "declar[ing] that the taking of all eleven of [H&P-V's] oil drilling rigs and associated property would be of 'public benefit and good.'" *Id.* ¶ 67. Taking up the Assembly's recommendation, then-President Chávez issued an "Expropriation Decree," which authorized the "forcible taking" of H&P-V's assets and declared that the "expropriated property [would] become the unencumbered and unlimited property of [PDVSA]." *Id.* ¶ 68. The complaint alleges that Venezuela's actions were driven, at least in part, by animus against H&P-V due to its "U.S. ownership." *Id.* ¶ 97.

Days after the decree, PDVSA filed two eminent domain suits in Venezuelan court to effectuate the expropriations. *Id.* ¶¶ 72–73. Neither proceeding, however, has progressed beyond the earliest stages, leaving H&P-V and H&P-IDC without compensation. *Id.* ¶¶ 86–87. In the meantime, PDVSA "ha[s] been operating H&P-V's Venezuelan business as a going concern—employing not only the [company's] real and personal property but also [its] drilling rig managers, drilling rig workers, and other professionals who were trained by, and formerly worked for, H&P-V." *Id.* ¶ 76. According to the complaint, "[t]he seizure constituted a taking of the entirety of [H&P-V and H&P-IDC's] Venezuelan business operations." *Id.* ¶ 75. In other words, Venezuela and PDVSA "took the entire business, which they now operate as a state-owned commercial enterprise," thus leaving H&P-V "[s]tripped of all its productive assets," *id.* ¶ 81, and without "any significant tangible property or . . . any commercial operations in Venezuela," *id.* ¶ 85.

In late 2011, H&P-V and H&P-IDC (collectively, H&P) sued PDVSA and Venezuela in the United States District Court for the District of Columbia, claiming as relevant here that the expropriation of H&P's "business and assets" without compensation violated international law. *Id.* ¶ 181. Venezuela and PDVSA moved to dismiss for lack of jurisdiction under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611, which provides that a foreign state, including "agenc[ies] or instrumentalit[ies]" like PDVSA, *id.* § 1603(a), "shall be immune from the jurisdiction of the courts of the United States" unless a statutory exception applies, *id.* § 1604. In response, H&P maintained that the alleged takings fit within one such exception, the "expropriation exception," which authorizes jurisdiction over a foreign state where "rights in property taken in violation of international law are in issue" and where—a matter not presently at issue—that property is

sufficiently connected to commercial activity inside the United States. *Id.* § 1605(a)(3).

To streamline resolution of this jurisdictional issue, the parties agreed to seek the district court's initial decision on several threshold matters on the basis of the complaint alone. Stipulation at 3. The parties asked the court to determine, first, whether H&P-V is "a national of Venezuela under international law" for purposes of the expropriation exception and, second, whether H&P-IDC has prudential standing to assert an expropriation claim. *Id.*

Based on its resolution of these threshold questions, the district court dismissed H&P-V's expropriation claim but held that H&P-IDC's could proceed. *See Helmerich I*, 971 F. Supp. 2d at 73. As for the Venezuelan-incorporated H&P-V, the court concluded that it is "considered a national of Venezuela under international law," *id.* at 61, and so failed to satisfy the expropriation exception's requirements because a state's seizure of its own national's property is not typically a "violation of international law," 28 U.S.C. § 1605(a)(3). As for the U.S.-incorporated H&P-IDC, the district court acknowledged that a corporate parent generally lacks prudential standing to enforce the rights of its subsidiary, *see Helmerich I*, 971 F. Supp. 2d at 70, but found that rule inapplicable because H&P-IDC sought "to enforce [*its*] *own* individual rights," *id.* at 71 (emphasis added). According to the complaint, Venezuela had "deprived H&P-IDC, individually, of its essential and unique rights as sole shareholder of H&P-V by dismantling its voting power, destroying its ownership, and frustrating its control over the company." *Id.* at 73. Because "[i]nternational custom" protects such ownership rights, *id.* at 73 n.11, the district court concluded that H&P-IDC's claim falls within the expropriation exception as long as it satisfies the exception's commercial-activity requirement.

On appeal, we ruled that *both* companies' claims could proceed. *See Helmerich II*, 784 F.3d at 808. Emphasizing that circuit precedent established a "forgiving standard," *id.* at 813, under which we would "grant a motion to dismiss on the grounds that the plaintiff has failed to plead a 'taking in violation of international law' . . . *only* if the claims [were] 'wholly insubstantial or frivolous,'" *id.* at 812 (quoting *Chabad*, 528 F.3d at 943), we found that both companies' expropriation claims cleared this "exceptionally low bar," *id.*

As for H&P-V, we acknowledged that, "generally, a foreign sovereign's expropriation of its own national's property does not violate international law," *id.*, but we went on to observe that H&P-V alleged "that Venezuela ha[d] unreasonably discriminated against it on the basis of its sole shareholder's nationality, thus implicating an exception" that the Second Circuit had announced in *Banco Nacional de Cuba v. Sabbatino*, 307 F.2d 845 (2d Cir. 1962), *rev'd on other grounds* 84 S. Ct. 923 (1964). *Helmerich II*, 784 F.3d at 812. Although characterizing *Sabbatino* as "[d]ated and uncited," we observed that it "remains good law" in the Second Circuit and found "[no] decision from any circuit that so completely forecloses H&P-V's discriminatory takings theory as to '*inescapably* render the claim[] frivolous' and '*completely* devoid of merit.'" *Id.* at 813 (emphases and alteration in original) (quoting *Hagans v. Lavine*, 415 U.S. 528, 538 (1974)).

As for H&P-IDC, we observed that, under United States law, "corporate ownership aside, shareholders may have rights in corporate property . . . 'by virtue of their exclusive beneficial ownership, control, and possession of the properties and businesses allegedly seized.'" *Id.* at 815 (quoting *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1516 (D.C. Cir. 1984) (en banc), *vacated* 471 U.S. 1113 (1985)). Because H&P-IDC

arguably "had property rights in [its] corporation's assets," *id.*, and because the expropriation of those assets arguably violated international law, we concluded that H&P-IDC had satisfied our circuit's standard by "put[ting] its rights in property in issue in a non-frivolous way." *Id.* at 816 (quoting *Chabad*, 528 F.3d at 941).

The Supreme Court vacated and remanded. *Helmerich III*, 137 S. Ct. at 1324. Rejecting the line of circuit precedent establishing the permissive standard this court had employed, the Supreme Court held that "a party's nonfrivolous, but ultimately incorrect, argument that property was taken in violation of international law is insufficient to confer jurisdiction" under the expropriation exception. *Id.* at 1316. It therefore remanded for this court to consider whether H&P's "factual allegations . . . make out a legally valid claim"—and not merely a non-frivolous one—"that a certain kind of right is at issue (*property* rights) and that the relevant property was taken in a certain way (in violation of international law)." *Id.*

Accordingly, we ask whether H&P-V and H&P-IDC, now deprived of the "forgiving standard" they previously enjoyed, *Helmerich II*, 784 F.3d at 813, have pled facts that "do show (and not just arguably show) a taking of property in violation of international law," *Helmerich III*, 137 S. Ct. at 1324. Considering the question de novo, *see Helmerich II*, 784 F.3d at 811, we separately address H&P-V and H&P-IDC's expropriation claims in Parts II and III, respectively. In Part IV, we address Venezuela's argument that any remaining claims against it—as distinct from PDVSA—must be dismissed in light of the expropriation exception's commercial-activity requirement. In conducting our analysis, we have benefited from the helpful *amicus* briefs submitted by the United States.

**II.**

All parties agree that H&P-V has adequately alleged that Venezuela and PDVSA have taken property in which it has rights, namely, its drilling rigs and related equipment. The parties disagree, however, over whether the complaint sufficiently alleges that those assets were taken "in violation of international law," as the expropriation exception requires. 28 U.S.C. § 1605(a)(3).

In arguing that H&P-V's claim falls outside the ambit of international law, Venezuela and PDVSA invoke the "so-called 'domestic takings rule,'" which provides that, as a general matter, "a foreign sovereign's expropriation of its own national's property does not violate international law." *Simon v. Republic of Hungary*, 812 F.3d 127, 144 (D.C. Cir. 2016) (quoting *Helmerich II*, 784 F.3d at 812). Acknowledging this rule, H&P-V argues that it does not govern here for two reasons: (1) H&P-V should be treated as a foreign company under international law because Venezuelan law considers it foreign for certain purposes, and (2) even if it is treated as a Venezuelan company, Venezuela's seizure of its property was motivated by a desire to harm its foreign owner, H&P-IDC, and so falls into an exception to the domestic-takings rule. We consider each argument in turn.

**A.**

The domestic-takings rule bars H&P-V's expropriation claim only if, in seizing H&P-V's assets, Venezuela expropriated the property of "its own national[]." *Helmerich II*, 784 F.3d at 812. Under international law, "a corporation has the nationality of the state under the laws of which the corporation is organized." Restatement (Third) of the Foreign Relations Law of the United States ("Third Restatement") § 213. Accordingly, H&P-V, a Venezuelan-incorporated company with a legal identity distinct from that of its

shareholders under local law, *see* Código de Comercio art. 201.3 (Venez.) ("Venezuelan Commercial Code"), is considered a Venezuelan national under international law.

H&P-V rejects this straightforward reasoning. Instead, it makes a two-step argument that international and Venezuelan law combine to strip it of its Venezuelan nationality for international-law purposes. First, it cites an International Court of Justice opinion, *The Barcelona Traction, Light and Power Co.* (Belg. v. Spain), 1970 I.C.J. 3 (Feb. 5), for the proposition that "[m]unicipal law determines the [international] legal situation . . . of . . . limited liability companies," *id.* at 34, ¶ 41. Next, it points out that a Venezuelan executive order in effect at the time of the expropriations at issue, Decree 356, denominated foreign-owned, domestically incorporated companies such as itself "[i]nternational investment[s]" entitled to special protections under domestic law. *Decree Having the Rank and Force of Law on Investment Promotion and Protection*, Decree No. 356, art. 3.2, Official Gazette No. 5,390 (Oct. 22, 1999) (Venez.) ("Decree 356"); *see also id.* art. 3.1 (defining "investment" to include "any of the corporate . . . forms allow[ed] by Venezuelan law"). So, the argument runs this way: international law directs us to "municipal law," and Venezuela's "municipal law" considered H&P-V "international" at the relevant time, so H&P-V must be "international" vis-à-vis Venezuela for purposes of its international-law claim.

This argument misconceives both international and Venezuelan law. As to the former, *Barcelona Traction* provides no support for the idea that a domestically incorporated company characterized as "international" under local law somehow loses its domestic status under international law. The "[m]unicipal law" that, according to *Barcelona Traction*, "determines [a company's] legal situation" under

international law, *Barcelona Traction*, 1970 I.C.J. at 34, ¶ 41, consists of the "generally accepted" principles that appear time and again in domestic legal systems throughout the world, and not, as H&P-V would have it, "the municipal law of a particular State," *id.* at 37, ¶ 50. After studying the generally accepted principles that govern the legal status of corporations under domestic legal systems, the *Barcelona Traction* court concluded that the limited liability company is typically characterized by its "legal personality," *id.* at 34, ¶ 40, and that the place of legal incorporation therefore governs such a company's nationality under international law, *see id.* at 42, ¶ 70.

Nor, in any event, does Venezuelan law establish H&P-V as "international" in any relevant sense. Purporting to create only domestic rights capable of enforcement by "the *national* courts or the *Venezuelan* arbitration tribunals," Decree 356 art. 23 (emphases added), Decree 356 nowhere promised to allow Venezuela's domestic corporations to enforce these rights in *international* tribunals. It is therefore not the sort of governmental declaration that "ha[s] the effect of creating legal obligations" under international law. *Nuclear Tests* (Austl. v. Fr.), 1974 I.C.J. 253, 267, ¶ 43 (Dec. 20); *cf., e.g.*, *Military and Paramilitary Activities in and Against Nicaragua* (Nicar. v. U.S.), 1984 I.C.J. 392, 418–19 (finding United States' declaration about its intent to submit to the jurisdiction of an international court to be binding).

In seizing H&P-V's assets, Venezuela may well have violated the local protections it promised foreign-owned, domestically incorporated companies in Decree 356. But because that decree does nothing to alter H&P-V's status as a Venezuelan company under international law, the domestic-takings rule applies: the proper place for a Venezuelan

company to assert its property rights against the Venezuelan government is a Venezuelan court.

**B.**

Given H&P-V's Venezuelan nationality, its takings claim against Venezuela is a matter of domestic, not international, law under the domestic-takings rule. H&P-V insists, however, that the rule has a relevant exception: if a state expropriates the property of a domestically incorporated company with the discriminatory aim of harming the company's foreign owners, it violates customary international law notwithstanding the domestic-takings rule. And because Venezuela's seizure of its assets was "discriminatory, based on . . . [its] connections to the United States," Compl. ¶ 180, H&P-V contends, it has properly alleged that its property was "taken in violation of international law," 28 U.S.C. § 1605(a)(3).

Venezuela and PDVSA beg to differ. They respond, first, that H&P-V has failed to demonstrate that international law recognizes a discrimination exception to the domestic-takings rule and, second, that even if such an exception exists, the complaint's factual allegations fail to plausibly establish that Venezuela's actions were motivated by discriminatory animus. Because we agree with Venezuela and PDVSA on the former point, we need not address the latter.

As an initial matter, H&P-V misunderstands its burden. Pointing to the fact that a foreign-state defendant "bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity," *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000), H&P-V apparently believes that in assessing its claim that its property was taken "in violation of international law," 28 U.S.C. § 1605(a)(3), we must accept any representation it chooses to make about the content of

international law unless Venezuela and PDVSA somehow definitively disprove it. This is not the law. Although H&P-V is correct that Venezuela and PDVSA "bear[] the ultimate burden of persuasion to show [an immunity] exception does not apply," H&P-V bears the "initial burden" of overcoming the Act's "presumption of immunity" by making out a legally sufficient case that an exception *does* apply in the first place. *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). In other words, as the Supreme Court made clear in this very case, H&P-V must present "a valid claim that 'property' has been 'taken in violation of international law,'" *Helmerich III*, 137 S. Ct. at 1318 (quoting 28 U.S.C. § 1605(a)(3)), before the burden shifts to Venezuela and PDVSA to disprove that claim.

Because H&P-V does not contend that any express international agreement, such as a treaty, entitles it to assert a cognizable discriminatory takings claim against its own state of incorporation, we ask whether H&P-V has shown that Venezuela has, in seizing its assets, violated customary international law, *see* Third Restatement § 102(1), *i.e.*, the "general and consistent practice" that states follow out of "a sense of legal obligation" to the international community, *id.* § 102(2). In conducting this inquiry, we give "substantial weight" to the judgments and opinions of national and international judicial bodies, scholarly writings, and unchallenged governmental pronouncements that "undertake to state a rule of international law." *Id.* § 103(2).

H&P-V has failed to make the requisite showing. Instead, it relies on an underwhelming hodgepodge of sources, none of which unmistakably contemplates a discrimination exception to the domestic-takings rule, and all of which derive from a single country—the United States—that expressly argues in its *amicus* brief in this case that no such exception exists. *See* U.S.

Br. 9–10 ("Customary international law does not ignore the nationality of a corporation even when it is alleged that the state's expropriation of a domestically incorporated company was motivated by discrimination against foreign shareholders."). Although this scattershot showing was sufficient the first time around, *i.e.*, to render H&P-V's claim that Venezuela violated international law neither "*inescapably . . .* frivolous" nor "*completely* devoid of merit," *Helmerich II*, 784 F.3d at 813 (quoting *Hagans*, 415 U.S. at 538, 543), it cannot now clear the higher hurdle of demonstrating that the discrimination exception H&P-V urges has in fact crystallized into an international norm that bears the heft of customary law.

H&P-V principally relies on *Sabbatino*, a 1962 Second Circuit decision that H&P-V reads to hold that a state violates international law if it seizes the assets of a domestically incorporated company out of a desire to harm the company's foreign owners. Decided against the backdrop of a Cuban executive resolution that authorized the expropriation of all American-owned property in Cuba, *Sabbatino* considered whether Cuba's uncompensated seizure of sugar belonging to a Cuban company that was more than 90% American-owned, *see Sabbatino*, 307 F.2d at 849–50, comported with "the rules and principles of international law," *id.* at 854. The court held that it did not. *See id.* at 868. Despite acknowledging the domestic-takings rule, the court "place[d] no significance . . . on the fact that [the company] was chartered in Cuba" because the expropriation was motivated by anti-American animus and, in the court's view, "[w]hen a foreign state treats a corporation in a particular way because of the nationality of its shareholders, it would be inconsistent . . . in passing on the validity of that treatment to look only to the 'nationality' of the corporate fiction." *Id.* at 861. Although *Sabbatino* was reversed on other grounds, *see Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), the Second Circuit on remand reaffirmed

"with emphasis" that the Cuban company's nationality was "of no particular significance" under international law because the expropriation targeted the company's American shareholders, *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 185 (2d Cir. 1967).

Venezuela and PDVSA, together with the United States, argue that H&P-V misreads *Sabbatino*. Pointing to the opinion's statement that "the nationality of the corporation is disregarded" under international law "when it is different from the nationality of most of the corporation's shareholders," *Sabbatino*, 307 F.2d at 861, they contend that the case relied on this "incorrect premise," U.S. Br. 9, rather than any discrimination principle, as the basis for rejecting application of the domestic-takings rule.

We agree that *Sabbatino* is wrong to the extent it suggests that corporate nationality under international law depends on the nationality of the corporate owners rather than the place of incorporation. *See supra* at 9–12. We need not, however, determine whether *Sabbatino* rested its rejection of the domestic-takings rule on this mistaken suggestion. Even assuming that it relied on the discrimination theory H&P-V urges, *Sabbatino*—a single, half-century-old case from a single intermediate court in a single country—is by itself insufficient to establish a "general and consistent practice of states." Third Restatement § 102(2); *see also Simon*, 812 F.3d at 146 (urging "caution before concluding that a state's actions against its own nationals infringe a prohibition of sufficiently universal acceptance to amount to a 'violation of international law'" (quoting 28 U.S.C. § 1605(a)(3))).

Nor do the scattered authorities beyond *Sabbatino* to which H&P-V points contain any clear suggestion that international law recognizes a discrimination exception to the

domestic-takings rule. As an initial matter, the authorities *Sabbatino* itself cited contain no such suggestion. Some sources it cited were voluntary settlements that made no pronouncement on the scope of international law. *See, e.g.*, *Settlement of the Claim of the Standard Oil Company of New Jersey Arising Out of the Destruction of Property in 1916*, *in* U.S. Dep't of State, 3 Papers Relating to the Foreign Relations of the United States, 1929, at 757–58, Docs. 858–59 (1944); *Settlement of the Controversy of the Tlahualilo Company with the Government of Mexico*, *in* U.S. Dep't of State, Papers Relating to the Foreign Relations of the United States, with the Address of the President to Congress, December 2, 1913, at 993–1010, Docs. 1295–99 (1920). And of the authorities *Sabbatino* cited that *did* evaluate a domestic taking under international law, none indicated that the motive of the state effecting the taking was relevant to legality. *See, e.g.*, *Arbitration of the Claim of Alsop and Company, an American Corporation, v. Chile, Award*, *in* U.S. Dep't of State, Papers Relating to the Foreign Relations of the United States, with the Annual Message of the President Transmitted to Congress, December 7, 1911, at 38–53, 41, Doc. 35 (1918) (rejecting Chile's attempt to invoke domestic-takings rule as "inconsistent with the terms" upon which the parties presented the case for arbitration); *Arbitration of Claims of the Salvador Commercial Company et al. v. Salvador*, *in* U.S. Dep't of State, Papers Relating to the Foreign Relations of the United States, with the Annual Message of the President Transmitted to Congress, December 2, 1902, at 838–73, 849, Docs. 799–800 (1903) (allowing a domestic-takings claim to proceed against a state that had granted a domestic concession to a foreigner on the condition that the foreigner incorporate domestically).

Just as the authorities upon which *Sabbatino* relied provide no support for a discrimination exception to the domestic-takings rule, neither do those that followed in *Sabbatino*'s

wake. H&P-V cites the United States' *amicus* brief in *Sabbatino*'s Supreme Court proceedings, but that brief—in contrast to the brief, adverse to H&P-V, that the United States has submitted here—takes no position on whether a state's discriminatory action against a domestic company violates international law. *See* Brief for the United States as Amicus Curiae at 2–3, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), *in* 2 I.L.M. 1009, 1012 (1963) (arguing only that United States courts should decline to adjudicate foreign governments' domestic acts). And of the law review articles H&P-V cites that agree with *Sabbatino* that the discriminatory confiscation of *foreign* property violates international law, none make any effort to justify applying that rule to the confiscated property of a *domestic* corporation. *See* Roland A. Paul, *The Act of State Doctrine: Revived but Suspended*, 113 U. Pa. L. Rev. 691, 706–07 (1965); John R. Stevenson, *The* Sabbatino *Case—Three Steps Forward and Two Steps Back*, 57 Am. J. Int'l L. 97, 97 (1963); Martin Domke, *Foreign Nationalizations: Some Aspects of Contemporary International Law*, 55 Am. J. Int'l L. 585, 602–03 (1961); Comment, *The Act of State Doctrine—Its Relation to Private and Public International Law*, 62 Colum. L. Rev. 1278, 1311 (1962).

Equally unpersuasive are H&P-V's citations to a U.S. ambassador's responses to the Cuban expropriation resolution that lay at the heart of the *Sabbatino* litigation. Although the ambassador characterized the resolution as "manifestly in violation of . . . international law" because it was "in its essence discriminatory," he, like the law review articles just mentioned, focused his criticism on the fact that the resolution "specifically limited . . . its application to the seizure of property *owned by nationals of the United States*." Press Release, U.S. Dep't of State, *U.S. Protests New Cuban Law Directed at American Property* (July 16, 1960), *in* 43 Department of State Bulletin 171, 171 (1960) (emphasis added); *see also* Press Release, U.S.

18

Dep't of State, *United States Protests Cuban Seizures of Property* (Aug. 9, 1960), *in* 43 Department of State Bulletin 316, 316 (1960) (expressing "indignant protest" over "the expropriation of property located in Cuba *of citizens of the United States*" (emphasis added)).

H&P-V next cites U.S. legislation enacted in response to the Cuban expropriations. It first points to a program established pursuant to the International Claims Settlement Act of 1949, 22 U.S.C. §§ 1621 *et seq.*, that provided a mechanism for "nationals of the United States" to submit expropriation claims against Cuba to the U.S. Foreign Claims Settlement Commission in order to allow that body to "obtain information concerning the total amount of such claims" for diplomatic purposes, *id.* § 1643. This program lends H&P-V no support. To be sure, the Commission, in at least one case, upheld the claim of an American parent company "for the value of its ownership interest" in a wholly owned Cuban subsidiary that Cuba had "seized." Foreign Claims Settlement Commission, *Final Report of the Foreign Claims Settlement Commission's Adjudication of Claims in Its Cuba Program* 374 (1972). But the fact that a nation violates a *foreign* company's rights under international law if it effects a discriminatory taking of that company's property, including an entire domestically incorporated subsidiary, *see infra* at 22–24, hardly suggests that international law gives a *domestic* company protection against *its own* government for the seizure of *its* property. H&P-V also points to a Foreign Assistance Act amendment that requires the President to suspend assistance to any foreign government that "has nationalized or expropriated or seized ownership or control of property owned by . . . any corporation, partnership, or association not less than 50 per centum beneficially owned by United States citizens" unless that government "take[s] appropriate steps . . . to discharge its obligations under international law toward such citizen or

entity." Act of Aug. 1, 1962, Pub. L. No. 87-565, § 301(d)(3), 76 Stat. 255, 261 (codified at 22 U.S.C. § 2370(e)(1)(A)). That amendment, however, offers no insight into what "steps" international law might require, especially where the majority American-owned company is incorporated domestically within the expropriating state. Finally, H&P-V contends that the expropriation exception to the Foreign Sovereign Immunities Act was intended to offer protection from the sorts of takings that Congress has elsewhere characterized as efforts by "radical governments" to "strik[e] a blow at the United States Government." S. Rep. No. 93-676, at 26 (1974). But H&P-V identifies nothing suggesting that Congress intended to extend this protection to companies organized under the laws of those very governments. *See generally* H. Comm. on Foreign Affairs, 88th Cong., *Expropriation of American-Owned Property by Foreign Governments in the Twentieth Century* 22–28 (1963), *in* 2 I.L.M. 1066, 1091–97 (1963).

Moving beyond the 1960s, H&P-V points to several bilateral investment treaties that prohibit a signatory from seizing the assets of a corporation organized under its laws if that corporation is the wholly owned subsidiary of a parent incorporated in a different signatory. These treaties, however, are specific, bargained-for agreements between nations and therefore offer little evidence that the signatories would perceive "a sense of legal obligation" to follow the same rules under international custom absent a negotiated treaty. Third Restatement § 102(2).

Finally, H&P-V turns to the Restatements, both Second and Third, of the Foreign Relations Law of the United States. This move is unavailing as well. The Third Restatement, although citing *Sabbatino*, Third Restatement § 712 Reporter's Note 5, points to no other authority that has adopted the discrimination theory it purportedly embraced. And while that

Restatement acknowledges that a nation with "significant links" to a company incorporated in a foreign country can sometimes represent that company diplomatically "against the state of incorporation itself," *id.* § 213 Reporter's Note 3, or can even choose to "treat the corporation as its national" for diplomatic purposes, *id.* § 213 cmt. *d*, it nowhere suggests that the company itself has an international-law claim against its state of incorporation in the event of a discriminatory expropriation, *see also Barcelona Traction*, 1970 I.C.J. at 41–45, ¶¶ 69–84 (noting that "the lack of capacity of [a] company's national State to act on its behalf" can be grounds for the corporate owners' state to offer diplomatic protection, *id.* 41 ¶ 69, but pointing out that "the claim of the State is not identical with that of the individual or corporate person whose cause is espoused," *id.* 44 ¶ 79).

Finding scant support in the more recent Third Restatement, H&P-V looks back fifty years to the Second. There, in the comments accompanying a rule involving dual citizens that never made its way into the Third Restatement, it finds a helpful example, also absent from the Third Restatement. *See* Restatement (Second) of the Foreign Relations Law of the United States § 171 cmt. *d*. The problem for H&P-V, however, is that the Restatement cites no support for the example. And given that the Restatement purports to codify international law, not to create it, its pronouncements are useful only if they flow from sources of positive law such as judicial authority or reasoned scholarly commentary.

In the end, then, aside from *Sabbatino*, H&P-V has pointed to a smattering of United States sources, most decades old, that stand for little beyond the proposition that a state violates international law by effecting the uncompensated or discriminatory seizure of *foreign-owned* assets. Nothing in these sources, however, casts doubt on the United States'

established position that this rule stops short of protecting assets that belong to a *domestically* incorporated company, even if international law under certain circumstances might permit a foreign state with ties to that company to intercede diplomatically on that company's behalf. Because H&P-V has therefore failed to show that the alleged seizure of its assets amounts to a "violation of international law," 28 U.S.C. § 1605(a)(3), we shall affirm the dismissal of its claim.

## III.

We turn now to H&P-IDC's expropriation claim. When this case was previously before us, we concluded that H&P-IDC had adequately put at issue its "rights in property taken in violation of international law" for purposes of the expropriation exception because (1) H&P-V presented a non-frivolous claim that its physical assets had been "taken in violation of international law," and (2) H&P-IDC made a non-frivolous argument that it had "rights in" H&P-V's property. 28 U.S.C. § 1605(a)(3); *see also Helmerich II*, 784 F.3d at 814–16. Having now concluded that H&P-V's property was *not* taken in violation of international law, however, *see supra* at 9–21, we are left to ask whether H&P-IDC has adequately alleged rights in some other property that was.

As a starting point, international law prohibits a state from taking "the property *of a national of another state*," unlike the property of its own national, without compensation. *See* Third Restatement § 712(1)(c) (emphasis added). Therefore, although the domestic-takings rule bars H&P-IDC from basing an expropriation claim on Venezuela's seizure of H&P-V's property, the rule does nothing to prohibit H&P-IDC from basing such a claim on Venezuela's seizure of *its own* property. Carefully heeding this distinction, H&P-IDC argues that it has put at issue two distinct property rights of its own that Venezuela and PDVSA have "taken in violation of

international law." 28 U.S.C. § 1605(a)(3). First, it argues broadly that Venezuela has unlawfully seized its ownership interest in its subsidiary, H&P-V. Second, and more narrowly, it argues that Venezuela has unlawfully seized its allegedly direct right under Venezuelan law to exercise some degree of control over H&P-V's expropriated assets.

**A.**

Most broadly, H&P-IDC contends that its right of ownership in its wholly owned subsidiary, H&P-V, constitutes "property taken in violation of international law." 28 U.S.C. § 1605(a)(3). Venezuela and PDVSA do not dispute that this right qualifies as "property" within the meaning of the expropriation exception. *Cf. Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470, 480 (D.C. Cir. 2007) (finding "no reason to distinguish between tangible and intangible property" for purposes of the exception). Our question, therefore, is whether H&P-IDC has adequately alleged that Venezuela and PDVSA expropriated H&P-V itself in violation of international law.

International law undisputedly protects the "direct rights" shareholders enjoy in connection with corporate ownership, including "the right to any declared dividend, the right to attend and vote at general meetings, [and] the right to share in the residual assets of the company on liquidation." *Barcelona Traction*, 1970 I.C.J. at 36, ¶ 47; *see* U.S. Supp. Br. 4–5. It is also well established that a state violates international law if it takes "measures that have an effect equivalent to a formal expropriation of [a foreign] shareholder's own property rights," even if the state does not formally divest the shareholder of its shares. *Id.* at 4; *see also, e.g.*, 2012 U.S. Model Bilateral Investment Treaty, Annex B (taking the view that customary international law prohibits actions that have "an effect equivalent to direct expropriation without formal transfer of

title"); *Tidewater Investment SRL v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Award, ¶ 104 (Mar. 13, 2015) ("[I]t is well accepted in international law that expropriation need not involve a taking of legal title to property."); Third Restatement § 712, cmt. *g* (defining takings to include "not only . . . avowed expropriations in which the government formally takes title to property, but also . . . other actions of the government that have the effect of 'taking' the property, in whole or in large part").

To be sure, not every state action that has a detrimental impact on a shareholder's interests amounts to an indirect expropriation of the shareholder's ownership rights. *See, e.g.*, *Barcelona Traction*, 1970 I.C.J. at 36, ¶ 46 ("[A]n act directed against and infringing only [a] company's rights does not involve responsibility towards the shareholders, even if their interests are affected."); U.S. Br. 12–13 ("[A] shareholder's direct rights generally are not implicated by state action that depreciates the value of a corporation's shares, even severely."). But where state action "is aimed at the direct rights of the shareholder as such," it can form the basis for an international expropriation claim. *Barcelona Traction*, 1970 I.C.J. at 36, ¶ 47. As the United States explains in its *amicus* brief:

> [W]hen a state permanently takes over management and control of [a foreign shareholder's] business, completely destroying the beneficial and productive value of the shareholder's ownership of their company, and leaving the shareholder with shares that have been rendered useless, it has indirectly expropriated the ownership of that business and has responsibility under customary

> international law to provide just compensation
> to the shareholder.

U.S. Supp. Br. 12. Venezuela and PDVSA concede that this explanation is "accurate," Defendants-Appellants' Supp. Br. 1, and we agree, *see, e.g.*, *Pope & Talbot Inc. v. Government of Canada*, Interim Award, ¶ 100 (NAFTA/UNCITRAL Arb. Trib. June 26, 2000) (understanding the "ordinary meaning" of expropriation "under international law" to include situations in which a foreign investment "has been nationalized" and determining whether nationalization has occurred by asking, among other things, whether "the Investor remains in control of the Investment" and "directs [its] day-to-day operations").

As it turns out, the parties' only real dispute in connection with H&P-IDC's attempt to ground an expropriation claim on the seizure of H&P-V itself is over whether the complaint adequately alleges that Venezuela and PDVSA have "permanently take[n] over management and control of [H&P-V's] business, completely destroying the beneficial and productive value of [H&P-IDC's] ownership of [its] company, and leaving [H&P-IDC] with shares that have been rendered useless." U.S. Supp. Br. 12. We have little trouble concluding that it does. The complaint expressly alleges that Venezuela and PDVSA have taken H&P-V's "entire business, which they now operate as a state-owned commercial enterprise," Compl. ¶ 81, and that H&P-V "no longer possesses any significant tangible property or maintains any commercial operations in Venezuela," *id.* ¶ 85. In other words, Venezuela and PDVSA are alleged to have taken over "the entirety of [H&P-IDC's] Venezuelan business operations," *id.* ¶ 75, thus "depriv[ing] H&P-IDC of its ownership and control of H&P-V," *id.* ¶ 139. These allegations describe the indirect expropriation of a shareholder's direct rights to a T.

25

Venezuela and PDVSA disagree. They complain that Venezuela has neither "appointed 'government directors' to run H&P-V," Defendants-Appellants' Supp. Br. 7, nor "asserted the right . . . to direct legal action on H&P-V's behalf," *id.* at 8. They also point to financial filings unmentioned in the complaint that, according to them, show that H&P-V has been actively pressing its own legal claims and collecting millions of dollars in consequence. *See id.* at 9.

These are certainly relevant considerations that could ultimately shed light on how much control H&P-IDC maintains over H&P-V and whether its ownership of H&P-V retains meaningful value. And, if propped up with evidentiary support, they might be considered along with other such relevant facts as part of the district court's ultimate "fact intensive, case-by-case inquiry" into whether Venezuela and PDVSA have in fact committed the act of which they stand accused, namely the wholesale nationalization of H&P-V. U.S. Supp. Br. 6.

At this point in the litigation, however, we look only to the facts alleged in the complaint, take them as true, and construe them in H&P-IDC's favor. *See Helmerich II*, 784 F.3d at 811; Stipulation at 2. Viewed through that lens, we think it quite obvious that those allegations sufficiently contend that Venezuela and PDVSA have entirely commandeered all of H&P-V's on-the-ground operations, leaving H&P-V with nothing but a nominal right to compensation that has proven worthless in Venezuela's courts and that, we hold today, cannot be vindicated here. In thus alleging that Venezuela and PDVSA have expropriated its subsidiary corporation, H&P-IDC has presented "a valid claim that 'property' has been 'taken in violation of international law.'" *Helmerich III*, 137 S. Ct. at 1318 (quoting 28 U.S.C. § 1605(a)(3)). We shall therefore affirm the district court's denial of the motions to dismiss H&P-IDC's expropriation claim and remand for the parties to

address any remaining threshold jurisdictional issues, including whether the expropriation exception's commercial-activity requirement has been satisfied.

**B.**

Invoking a second, far narrower property interest alleged to have been "taken in violation of international law," 28 U.S.C. § 1605(a)(3), H&P-IDC argues that Venezuela and PDVSA have unlawfully expropriated its allegedly direct right under Venezuelan law to exercise some level of control over H&P-V's drilling equipment. Though acknowledging that the equipment itself belonged to H&P-V, *see* Venezuelan Commercial Code art. 208 ("[P]roperty contributed by [corporate] partners becomes the property of the company . . . ."), H&P-IDC argues that as H&P-V's sole owner it enjoyed certain rights in those assets under Venezuelan law, such as the right to approve their sale, *see id.* art. 280(4). Accordingly, it goes on, when Venezuela and PDVSA seized H&P-V's drilling rigs, they seized not only the rigs themselves, but also H&P-IDC's direct rights in those rigs. And those rights, the argument runs, while less comprehensive than the full bundle of rights that ownership affords, nonetheless constitute legally recognized "property" subjected to uncompensated, and therefore unlawful, expropriation by a foreign government.

Given that we shall remand for further district-court proceedings in connection with H&P-IDC's broader claim, that Venezuela and PDVSA expropriated H&P-V in its entirety, *see supra* at 22–25, we think it best not to address this narrower claim in the first instance, especially given that it raises difficult questions about the scope of a parent company's rights in its subsidiary's assets under Venezuelan law and about the extent to which international law protects those rights, whatever they might be. Should it become necessary for us to

reach these tricky questions, we would be greatly aided by the considered judgment of the district court, which has yet to weigh in. We shall therefore leave it to that court to consider H&P-IDC's narrower claim, if necessary, on remand.

**IV.**

One loose end remains. Venezuela argues that *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016), requires the dismissal of all remaining claims against it, such that only claims against PDVSA may proceed. *Simon* held that the expropriation exception's commercial-activity requirement authorizes jurisdiction over expropriation claims against a foreign state itself—as distinct from its agency or instrumentality—only if the expropriated property "or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." *Id.* at 146 (quoting 28 U.S.C. § 1605(a)(3)). Because H&P's complaint contains no allegation that this condition has been satisfied, Venezuela argues, *Simon* requires this court to find that sovereign immunity protects Venezuela from ongoing proceedings in this case.

The district court declined to rule on this issue, principally because it is "not one of the initial issues that the parties jointly agreed to brief prior to jurisdictional discovery." *Helmerich I*, 185 F. Supp. 3d at 239. We, too, decline to do so, for the same reason. We understand that *de Csepel v. Republic of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017), forecloses what appears to be H&P's main argument—that courts in our circuit are free to disregard *Simon* in light of an earlier decision, distinguished in *de Csepel*, that allowed an expropriation claim to proceed against Russia without requiring that the expropriated property (or property exchanged for it) be present in the United States. *See id.* at 1104–07 (making clear that *Simon*, not the earlier

decision, is binding circuit law on this point). That said, we are mindful that H&P may yet have other arguments that it has not yet had the chance to present due to the way the parties have chosen to structure this litigation. The district court, with its insight into the twists and turns this case has taken, is in the best position to determine how to proceed, and we leave it to that court to rule on this issue in the first instance.

## V.

For the foregoing reasons, we affirm the district court's dismissal of H&P-V's expropriation claim for lack of jurisdiction, as well as its denial of Venezuela and PDVSA's motions to dismiss H&P-IDC's claim, and remand for further proceedings consistent with this opinion.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, concurring in part and concurring in the judgment: I fully concur in my colleagues' opinion with respect to the claims of Helmerich & Payne de Venezuela, C.A. I have misgivings concerning Part III of the court's opinion.

In my dissent from the original circuit opinion, *Helmerich & Payne International Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 819 (D.C. Cir. 2015), I set out my reasons for concluding that we do not have jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604, over the claims of Helmerich & Payne International Drilling Co. Nothing in the Supreme Court's opinion or in my colleagues' present opinion has changed my mind. However, I recognize the wisdom of the majority's determination that:

> Given that we shall remand for further district-court proceedings in connection with H&P-IDC's broader claim, that Venezuela and PDVSA expropriated H&P-V in its entirety, *see supra* at 22-25, we think it best not to address this narrower claim in the first instance, especially given that it raises difficult questions about the scope of a parent company's rights in its subsidiary's assets under Venezuelan law and about the extent to which international law protects those rights . . . .

Maj. Op. at 26-27. I therefore, with some reluctance, join the judgment of the court.